**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 4, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WENDY CAROLINA MIGUEL-PENA;
BNRM,

     Petitioners,

v.                                                                                   No. 22-9580

MERRICK B. GARLAND, United States
Attorney General,

     Respondent.
_____

**Appeal from the Board of Immigration Appeals**
**(Petition for Review)**
_____

Marti L. Jones, Of Counsel, Stowell, Crayk, Salt Lake City, Utah for the Petitioners.

Michael C. Heyse, Senior Litigation Counsel (Erik R. Quick, Trial Attorney, and Patrick J. Glen, Senior Litigation Counsel, with him on the briefs), United States Department of Justice, Washington, D.C. for Respondent.
_____

Before **TYMKOVICH**, **MATHESON**, and **BACHARACH**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

     Wendy Miguel-Peña and her minor daughter (collectively, "Petitioners"), natives

and citizens of El Salvador, entered the United States without authorization in August

2016.  The Department of Homeland Security ("DHS") initiated removal proceedings by serving Petitioners with notices to appear ("NTAs").  An immigration judge ("IJ") found Petitioners removable, denied their motion to terminate removal proceedings, and determined them ineligible for asylum or protection under the Convention Against Torture ("CAT").  Petitioners appealed, and the Board of Immigration Appeals ("BIA") dismissed their appeal in a single-member order.

Petitioners seek review of the BIA's order.  They allege the IJ and BIA erred in (1) denying their motion to terminate and (2) denying Ms. Miguel-Peña's asylum claim based on (a) finding no nexus between alleged persecution and a protected ground and (b) holding that "women business owners in El Salvador" is not an immutable particular social group ("PSG").

Exercising jurisdiction under 8 U.S.C. § 1252(a), we deny the petition.

## I.  BACKGROUND

### A.  *Notices To Appear*

In August 2016, DHS detained Petitioners after they crossed the United States border.  While they were detained, DHS served them with NTAs, charging documents that commence removal proceedings.  The NTAs directed them to appear before an IJ in Miami, Florida, at a date and time "To Be Determined."  A.R., Vol. III at 793, 795.

### B.  *IJ Proceedings*

#### 1.  Removal Order and Application for Relief

After DHS released Petitioners, they settled in Salt Lake City, Utah, where the removal proceedings were transferred.  In March 2017, Petitioners appeared with counsel

before an IJ, admitted the allegations in the NTAs, and conceded removability. *See* A.R., Vol. I at 179-81.

The IJ sustained the removability charge, and Petitioners sought relief from removal. Ms. Miguel-Peña applied for asylum, withholding of removal, and protection under the CAT.[1] She included her daughter as a derivative applicant.[2]

### 2.  Motion to Terminate Removal Proceedings

In February 2019, Petitioners filed a motion to terminate removal proceedings. *See* A.R., Vol. III at 784-91. Relying on *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), they argued that because their NTAs lacked the removal hearing's date, time, or location, the IJ lacked jurisdiction over their proceedings. *Id.* at 785, 788-90. In March 2019, the IJ denied Petitioners' motion to terminate without explanation. *Id.* at 779.

### 3.  Ms. Miguel-Peña's Declaration and Brief

Before her IJ hearing, Ms. Miguel-Peña submitted a written declaration and counseled brief. In her declaration, she said she had owned a small convenience store in El Salvador and reported the following:

> In mid-June 2016, MS-13 gang members put a note under the front door [of my store] telling me I had to pay $50 US[D] every day to them. The note said I would suffer the consequences if I did not pay. I understood that meant they would use violence against me. The note said a person would

---

[1] Although Ms. Miguel-Peña also applied for withholding of removal and protection under the CAT, only her asylum application is relevant on appeal.

[2] Because Ms. Miguel-Peña's daughter's asylum claim derived from her mother's, we refer to the factual allegations and arguments in the asylum application as Ms. Miguel-Peña's.

> come by to collect the money. The note had the initials MS-13 on it. I was afraid.
>
> About five days later, a young man came to my store. He said that I knew why he was there. I told him I did not have the money to pay. I was afraid.
>
> In mid-July 2016, I found another note in my store . . . on the balcony around 5:00 pm. Three people had been in my store. I do not know which one left the note. The second note said that because I had not paid the money, they were going to attack me and my daughter. Like the first note, the second note had the initials MS-13 on it.
>
> I was terrified for myself and my daughter. My store was very small. I did not make very much money. I did not have money to pay. Even if I had the money, I would not pay the money the gang demanded because I think gang control is wrong.

A.R., Vol. I at 249. She also described hearing "gunshots in the street in front of [her] house and store" and seeing "someone had shot a young woman dead." *Id.* She further stated, "Everyone said it was MS-13 that shot [the young woman] because she had not paid the extortion money." *Id.*

In her brief before the IJ, Ms. Miguel-Peña said she held an "anti-gang political opinion," *id.* at 238, and was a member of a PSG of "Women Small Business Owners in El Salvador," *id.* at 241. She contended that the threats she received constituted past persecution and made her fear future persecution. *Id.* at 233-36.

4. **The IJ's Decision**

In May 2019, the IJ held a hearing to consider Petitioners' application for asylum, withholding of removal, and protection under the CAT. The IJ denied all relief.

4

The IJ denied asylum, holding that Ms. Miguel-Peña did not suffer persecution or have a well-founded fear of future persecution on account of her political opinion or membership in a PSG. Specifically, the IJ found:

- The alleged persecutors—MS-13 gang members—were part of "a criminal organization," *id.* at 146, and Ms. Miguel-Peña's refusal to comply with their extortionate payment demands was "not a political act," *id.* at 147.

- MS-13's "targeting [was] applied indiscriminately across various professions and various groups of individuals that the gang [thought] best able to pay their extortion demands." *Id.* at 148.

- No nexus existed between the alleged persecution and Ms. Miguel-Peña's political opinions or her asserted PSG. *Id.* at 145, 148.

- Ms. Miguel-Peña's asserted PSG—"women business owners in El Salvador"—is not immutable because she could relinquish her business ownership. *Id.* at 147-48.

Because Ms. Miguel-Peña's daughter's asylum application derived from her mother's, the IJ also denied the daughter's asylum claim. The IJ entered a final order of removal for Petitioners.

Petitioners appealed to the BIA.

## C. *BIA Proceedings*

In their appeal to the BIA, Petitioners challenged the IJ's denial of their motion to terminate removal proceedings and denial of their asylum application.[3]

---

[3] Petitioners did not appeal the IJ's denial of their withholding of removal and CAT applications.

1. **Petitioners' Arguments**

On the motion to terminate, Petitioners argued that the defective NTAs and the NTAs' improper service violated due process. *Id.* at 17, 18-21. They abandoned their previous argument that the defective NTAs deprived the IJ of jurisdiction. *See id.*

On asylum, Petitioners argued the IJ erred in denying their application by considering MS-13's criminal extortion goals as the gang members' motive for persecuting Ms. Miguel-Peña, *id.* at 18, 24-26, 48-50, and by finding "women business owners in El Salvador" is not an immutable social group, *id.* at 18, 40-44.

2. **BIA Decision**

The BIA issued a single-member decision. It affirmed the IJ and dismissed Petitioners' appeal, *id.* at 3-7, making the IJ's removal order final, s*ee* 8 C.F.R. § 1241.1(a).

On the motion to terminate, the BIA addressed Petitioners' due process argument about the defective NTAs as if they had asserted the jurisdictional argument they made before the IJ. A.R., Vol. I at 4. It said that BIA and Tenth Circuit precedent holding that the lack of time or place in an NTA was not a jurisdictional defect "squarely foreclosed" the jurisdictional argument. *Id*. The BIA also held Petitioners had waived their argument that the NTAs were improperly served. *Id.*

On asylum, the BIA found no nexus between Ms. Miguel-Peña's alleged persecution and asserted political opinion because the IJ's finding that "the gang members who threatened [her] d[id] so as part of an indiscriminate effort to extort money" was "not clearly erroneous." *Id.* at 4-5. It did not evaluate whether Ms. Miguel-

6

Peña's alleged persecution was on account of her asserted PSG.  The BIA agreed with the IJ that "women business owners in El Salvador" is not an immutable PSG.  *Id.* at 5-6.

## D.  *Tenth Circuit Appeal*

Petitioners timely petitioned this court for review.  They allege the BIA erred in affirming the IJ's denial of (A) the motion to terminate and (B) asylum based on (i) finding no nexus between the alleged persecution and the asserted grounds for asylum and (ii) holding "women business owners in El Salvador" is not a PSG.

After the parties filed their briefs, the Supreme Court decided *Santos-Zacaria v. Garland*, 143 S. Ct. 1103 (2023).  The Tenth Circuit had previously held that the exhaustion requirement in 8 U.S.C § 1252(d)(1) was a jurisdictional bar to appellate review of immigration decisions.  *See, e.g.*, *Robles-Garcia v. Barr*, 944 F.3d 1280, 1283-84 (10th Cir. 2019).  *Santos-Zacaria* abrogated this precedent by holding that § 1252(d)(1) is a non-jurisdictional "claim-processing rule."  143 S. Ct. at 1112-13.  We requested the parties file supplemental briefs addressing *Santos-Zacaria*'s impact on this case.

After the first round of supplemental briefing, we ordered a second round to address three issues:

> (1)  May this court raise the exhaustion issue sua sponte, even though it is non-jurisdictional?
>
> (2)  As to the claim-processing theory [P]etitioners present in their opening brief, did they exhaust this theory before the agency?
>
> (3)  Assuming (i) [P]etitioners did not exhaust their claim-processing theory before the agency, (ii) the

> [G]overnment waived any exhaustion argument as to that
> theory, and (iii) the court does not enforce exhaustion sua
> sponte, are [P]etitioners correct that the alleged NTA
> defects they pointed out to the IJ are a violation of a
> claim-processing rule, and that the proper remedy for such
> a violation is dismissal of removal proceedings?

Doc. 11031704, at 2-3.

## II.  DISCUSSION

We review the BIA's legal conclusions de novo.  *Igiebor v. Barr*, 981 F.3d 1123,

1131 (10th Cir. 2020).  We review the BIA's factual findings for substantial evidence.

*Id.*  Under that standard, we will not reverse "unless the record demonstrates that 'any

reasonable adjudicator would be compelled to conclude to the contrary.'"  *Estrada-*

*Escobar v. Ashcroft*, 376 F.3d 1042, 1046 (10th Cir. 2004) (quoting 8 U.S.C.

§ 1252(b)(4)(B)).

When, as here, a single BIA member "issue[s] a reasoned decision addressing [a

petitioner's] arguments on appeal," we confine our review to "the BIA's decision . . . and

will not address the IJ's decision except where the BIA has explicitly incorporated his

reasoning."  *Luevano v. Holder*, 660 F.3d 1207, 1211 (10th Cir. 2011).

### A.  *Motion to Terminate Removal Proceedings Based on Defective NTAs*

Petitioners argue their NTAs were defective and improperly served in violation of

claim-processing rules and that the BIA therefore erred in denying their motion to

terminate the removal proceedings.  We do not decide this issue because Petitioners

failed to exhaust their claim-processing arguments before the agency.

8

1.  **Legal Background**

The following provides legal background on two types of claim-processing rules: (1) NTA requirements under 8 U.S.C. § 1229(a) and (2) exhaustion under 8 U.S.C. § 1252(d)(1).  "Claim-processing rules . . . seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."  *Santos-Zacaria*, 143 S. Ct. at 1112 (quotations omitted).  Unlike jurisdictional rules, claim-processing rules can be forfeited or waived.  *Id*.

a.  *NTA requirements*

i.  *Pereira* – NTAs must include time and place of removal proceedings

An NTA is a charging document that instructs individuals to appear before an IJ for removal proceedings.  Among other requirements, it must include "[t]he time and place at which the proceedings will be held."  8 U.S.C. § 1229(a).  "In 1997, . . . the Attorney General promulgated a regulation that a notice to appear . . . need only provide 'the time, place and date of the initial removal hearing, *where practicable*.'"  *Pereira*, 138 S. Ct. at 2111 (quoting 62 Fed. Reg. 10,332 (1997), codified at 8 C.F.R. § 1003.18(b)) (emphasis added).  "Per that regulation, the Department of Homeland Security . . . almost always serve[d] noncitizens with notices that fail[ed] to specify the time, place, or date of initial removal hearings whenever the agency deem[ed] it impracticable to include such information."  *Id*.

In 2019, the Supreme Court in *Pereira* addressed the tension between the statute requiring the time and place to appear in an NTA and the regulation requiring that information only where practicable.  *See id.* at 2113-14.  The petitioner was seeking

9

cancellation of removal and needed to show "10 years of continuous physical presence in the United States." *Id.* at 2109. "[T]hat period of continuous physical presence is deemed to end . . . when the alien is served a notice to appear under section 1229(a)." *Id.* (quotations omitted). The Court held that an NTA that lacks the time and place of removal proceedings "is not a notice to appear under section 1229(a)," so the defective NTA did not stop the petitioner's continuous presence. *Id.* at 2110 (quotations omitted).

ii. *Martinez-Perez* – NTA requirements are claim-processing rules

In *Martinez-Perez v. Barr*, 947 F.3d 1273 (10th Cir. 2020), we held that a statutorily defective NTA does not deprive the IJ of jurisdiction because § 1229(a) is a claim-processing rule, not a jurisdiction-conferring requirement. *Id*. at 1278-79; *see also United States v. Lira-Ramirez*, 951 F.3d 1258, 1261 (10th Cir. 2020); *Singh v. Garland*, Nos. 19-9574 & 22-9505, 2022 WL 6827392, at *3 (10th Cir. Oct. 12, 2022) (unpublished); *Matter of Arambula-Bravo*, 28 I&N Dec. 388, 389-92 (BIA 2021).[4]

b. Santos-Zacaria – *issue exhaustion under § 1252(d)(1) is a claim-processing rule*

A federal circuit court may "review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). In other words, "an alien must present the *same specific legal theory* to the BIA before he or she may advance it in court." *Garcia-Carbajal v. Holder*, 625 F.3d

---

[4] Although not precedential, we find the reasoning of unpublished decisions cited in this opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

1233, 1237 (10th Cir. 2010), *abrogated on other grounds by Santos-Zacaria*, 143 S. Ct. 1103. "[P]resenting [the same] *conclusion* or *request for relief* to the BIA isn't enough . . . ." *Id.* at 1238.

Issue exhaustion is both "a statutory command" under § 1252(d)(1) and part of the "fundamental principle of administrative law that an agency must have the opportunity to rule on a challenger's arguments before the challenger may bring those arguments to court." *Id.* at 1237. This principle echoes the foundational *Chenery* requirement that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *see also Uanreroro v. Gonzales*, 443 F.3d 1197, 1205 (10th Cir. 2006) ("We are not at liberty to search for grounds to affirm that were not relied upon by the agency.").

In *Santos-Zacaria*, the Supreme Court held that § 1252(d)(1)'s exhaustion requirement is a non-jurisdictional "claim-processing rule," 143 S. Ct. at 1114, meaning compliance is "mandatory" but "subject to waiver and forfeiture," *id.* at 1115-16. *Santos-Zacaria* addressed exhaustion of remedies. *Id.* at 1120 n.10 ("[W]e do not address . . . what obligations noncitizens have to present specific issues when appearing before the agency.") But we have applied its reasoning to hold that issue exhaustion is "a mandatory claim-processing rule [that] should be enforced where . . . a party timely and properly objects." *Gomez v. Garland*, No. 22-9585, 2023 WL 7126420, at *5 (10th Cir.

11

Oct. 30, 2023) (unpublished) (citation omitted).[5]  Thus, like remedy exhaustion, issue exhaustion is a claim-processing rule that is mandatory but subject to forfeiture and waiver.  We enforce the exhaustion requirement by declining to consider the unexhausted issue.  *Id.*

### 2.  **Application**

The foregoing discussion identifies two types of claim-processing rules.  First, *Martinez-Perez* held that the § 1229(a) NTA requirements are claim-processing rules. Second, *Santos-Zacaria* held that the § 1252(d)(1) exhaustion requirement is a claim-processing rule.  Both are relevant here.

Petitioners argue on appeal that the BIA erred in failing to enforce § 1229(a) claim-processing rules by disregarding defects in Petitioners' NTAs.  But the procedural history of this case raises whether Petitioners complied with the § 1252(d)(1) claim-processing rule requiring exhaustion of their § 1229(a) claim-processing arguments.  We

---

[5] *See also Araujo-Sotelo v. Garland*, No. 22-9524, 2023 WL 4363636 (10th Cir. July 6, 2023); *A.B. v. Garland*, No. 21-9584, 2023 WL 4533236 (10th Cir. July 13, 2023); *Dominguez Ogaz v. Garland*, No. 22-9584, 2023 WL 5319215 (10th Cir. Aug. 18, 2023); *Suazo-Espinales v. Garland*, No. 22-9587, 2023 WL 5573251 (10th Cir. Aug. 29, 2023); *Jiminez-Castro v. Garland*, No. 22-9571, 2023 WL 6620069 (10th Cir. Oct. 11, 2023); *Salas-Montero v. Garland*, No. 22-9564, 2023 WL 6873483 (10th Cir. Oct. 18, 2023); *Chavez-Ramirez v. Garland*, No. 22-9575, 2023 WL 6873542 (10th Cir. Oct. 18, 2023); *Gomez v. Garland*, No. 22-9585, 2023 WL 7126420 (10th Cir. Oct. 30, 2023); *Velasquez-Sierra v. Garland*, No. 22-9556, 2023 WL 7179437 (10th Cir. Nov. 1, 2023); *Tobo v. Garland*, No. 23-9500, 2023 WL 7411346 (10th Cir. Nov. 9, 2023); *Perez-Garcia v. Garland*, No. 22-9543, 2023 WL 8110076 (10th Cir. Nov. 22, 2023); *Aviles-Ramos v. Garland*, No. 22-9569, 2023 WL 8233507 (10th Cir. Nov. 28, 2023); *Valle-Hernandez v. Garland*, No. 22-9588, 2024 WL 323441 (10th Cir. Jan. 29, 2024) (all unpublished).

conclude that Petitioners failed to exhaust under § 1252(d)(1) and therefore do not reach their arguments about § 1229(a) NTA defects. *See Gomez,* 2023 WL 7126420 at *5 (denying the petition for review of an unexhausted claim).

    a.  *Petitioners' failure to exhaust their NTA claim-processing arguments*

On appeal, Petitioners contend their NTAs had "content-related" defects because they lacked information required by § 1229(a): the hearing's time and date, the consequences of failing to appear, the requirement to inform the IJ of a change of contact information and the consequences for failing to do so, the right to legal representation, and the correct location. Pet. Br. at 13. Petitioners also argue their NTAs had "service-related" defects because no certificate of service was attached to the NTAs and Petitioners never conceded service. *Id*. at 15-17.[6] They contend these defects violated § 1229(a) claim-processing rules and that the IJ and BIA erred in failing to consider the defects in denying Petitioners' motion to terminate removal proceedings. *Id.* at 1.

Under § 1252(d)(1), Petitioners failed to exhaust their arguments that their NTAs violated § 1229(a) claim-processing rules.

    i.  <u>Content-related NTA defects</u>

Before the IJ, Petitioners argued the NTAs' content-related defects deprived the IJ of jurisdiction. *See* A.R., Vol. III at 785-91. They did not argue the defects violated due

---

[6] The Government argues that the BIA "correctly found that Petitioners . . . conceded proper service orally and in writing." Resp. Br. at 15. We need not address whether Petitioners conceded service of the NTAs because we decide they failed to exhaust their defective service issue.

process or claim-processing rules. Before the BIA, they argued the content-related defects caused "numerous . . . violations of statutory and regulatory due process requirements." A.R., Vol. I at 18. Petitioners said they were making a "constitutional due process" argument and mentioned "claims processing rules" only once to contrast their due process argument with a claim-processing argument. *Id.* at 20.[7]

### ii. Service-related NTA defects

Petitioners also failed to exhaust their theory before the agency that the alleged service-related defects violated a claim-processing rule. They did not present this argument to the IJ. *See* A.R., Vol. III at 785-91. Before the BIA, they argued that the service-related defects violated "statutory and regulatory due process requirements." A.R., Vol. I at 18. They again said their argument was based on "constitutional due process," not a claim-processing rule. *Id.* at 20.

### b. *Government's briefs on failure to exhaust*

We next consider whether the Government "timely and properly" objected to Petitioners' failure to exhaust. *See Gomez*, 2023 WL7126420, at *5.

### i. Content-related NTA defects

In its response to Petitioners' opening brief, the Government did not object based on § 1252(d)(1) to Petitioners' failure to exhaust their claim-processing arguments about

---

[7] The BIA misconstrued Petitioners' due process argument when it stated the NTA defects did not deprive the IJ of jurisdiction. A.R., Vol. I at 4. The BIA's apparent confusion does not change the fact that Petitioners did not argue before the IJ or BIA that the NTAs' § 1229(a) defects violated claim-processing rules.

§ 1229(a) content-related defects.  The Government never mentioned the phrase "claim-processing."  *See* Resp. Br. at 15.  It instead quoted the BIA Opinion—which had mistakenly treated Petitioners' due process argument as jurisdictional—to argue Petitioners' motion to terminate "was 'squarely foreclosed by controlling circuit court and Board precedent.'"  *Id.* (quoting A.R., Vol. I at 4).[8]

In its first supplemental brief, the Government stated that its response brief "argued that Petitioners' opening brief contains unexhausted claims – including:  . . . defects about the NTAs," Supp. Resp. Br. at 4, and this issue is thus "not properly before this Court," *id.* at 5.  As noted, we do not read the Government's initial response brief as having made an exhaustion objection to the Petitioners' claim-processing arguments.  After this court ordered it to do so, the Government addressed exhaustion in its second supplemental brief.

---

[8] In its response brief, the Government objected that Petitioners raised new, unexhausted content-related defects:  the lack of information on the consequences of failing to appear, change of address or phone number requirements and the potential consequences of failing to inform DHS of such changes, and the right to legal representation.  Resp. Br. at 16.  Petitioners' earlier content-related arguments concerned only the date, time, and location of the removal hearing.  *See* A.R., Vol. III at 785-89.  The Government properly objected to these newly raised alleged defects.  We agree they were unexhausted and do not consider them.  *See* 8 U.S.C. § 1252(d)(1).

ii. Service-related NTA defects

In its response brief, the Government argued this court "lacks jurisdiction over Petitioners' unexhausted defective NTA service claims." Resp. Br. at 15.[9] It did not explain how Petitioners' claim-processing argument on appeal differs from their argument to the BIA. Instead, the Government broadly contended that Petitioners failed to exhaust because they "failed to raise their NTA service dispute before the [IJ]." *Id*.

\* \* \* \*

The foregoing raises a question of whether the Government adequately preserved an objection in its appellate briefing to Petitioners' failure to exhaust their § 1229(a) claim-processing arguments under § 1252(d)(1). The Government did not address whether Petitioners failed to exhaust their claim-processing arguments about alleged NTA content defects until we ordered it to do so in its second supplemental brief. *See* Doc. 11031704, at 1. It fared better on the Petitioners' service-related NTA claim-processing arguments, broadly contending that Petitioners failed to exhaust them before the agency.

The Government at most forfeited an objection to Petitioners' failure to exhaust. "A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve." *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012). The Government argues it never knowingly and

---

[9] At the time, the Government understandably argued we lacked jurisdiction over unexhausted arguments because its brief was filed before *Santos-Zacaria*. *See Robles-Garcia*, 944 F.3d at 1283 (exhaustion was jurisdictional).

16

intelligently relinquished its exhaustion objections.  *See* Second Supp. Resp. Br. at 7 (citing *Wood*, 566 U.S. at 473).  We agree.

Thus, if the Government "timely and properly" objected to Petitioners' failure to exhaust their § 1229(a) claim-processing arguments, we would not reach them.  *Gomez*, 2023 WL 7126420, at *5.  But even if the Government did not adequately object, we may invoke failure to exhaust on our own and still not reach Petitioners' § 1229(a) unexhausted arguments.

c.  *Addressing failure to exhaust*

The parties agree that in some circumstances a court may be "permitted, but not obliged, to consider[] *sua sponte*" whether a party has complied with a non-jurisdictional claim-processing rule.  *Day v. McDonough*, 547 U.S. 198, 209 (2006); *see* Second Supp. Resp. Br. at 1; Second Supp. Pet. Br. at 1.  A court may do so when the opposing party has forfeited an objection and the claim-processing rule "implicates values beyond the concerns of the parties."  *Wood*, 566 U.S. at 472 (alterations and quotations omitted); *see also Day*, 547 U.S. at 209; *United States v. Mitchell*, 518 F.3d 740, 744-51 (10th Cir. 2008); *Hardiman v. Reynolds*, 971 F.2d 500, 502 (10th Cir. 1992); *Hines v. United States*, 971 F.2d 506, 508-09 (10th Cir. 1992).

Because the Supreme Court stated the "implicates values" standard in state-prisoner habeas cases, it considered values served by habeas claim-processing rules such as comity and efficiency.  *See Granberry v. Greer*, 481 U.S. 129, 134-35 (1987); *Day*, 547 U.S. at 208-09; *Wood*, 566 U.S. at 472-73.  We have applied the standard to decide

17

whether Federal Rule of Appellate Procedure 4(b)(1)'s time bar "implicates judicial interests beyond those of the parties," holding that it does. *Mitchell*, 518 F.3d at 750.

Here, the claim-processing rule requiring exhaustion under § 1252(d)(1) "substantially implicates nonparty interests sufficiently weighty to permit sua sponte judicial review." *Hines*, 971 F.2d at 509. "It is a fundamental principle of administrative law that an agency must have the opportunity to rule on a challenger's arguments before the challenger may bring those arguments to court." *Garcia-Carbajal*, 625 F.3d at 1237; *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "A reviewing court usurps the agency's function when it" reaches "a ground not theretofore presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Garcia-Carbajal*, 625 F.3d at 1237 (alterations omitted) (quoting *Unemp. Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)). Under *Chenery*, we should not decide a petitioner's challenge to a BIA order on grounds that the agency did not rely upon or disclose in the record. *See Chenery*, 318 U.S. at 87; *see also Uanreroro*, 443 F.3d at 1205.

This principle "bears special force in the immigration context, where Congress has reduced it to a statutory command." *Garcia-Carbajal*, 625 F.3d at 1237; *see* 8 U.S.C. § 1252(d)(1).[10] To address issues that were not exhausted before the IJ and BIA "would propel the court into the domain which Congress has set aside exclusively for the

---

[10] The exhaustion requirement for federal habeas review of a state conviction and sentence also is a statutory command. *See* 28 U.S.C. § 2254(b)(1)(A).

administrative agency." *Carpio v. Holder*, 592 F.3d 1091, 1103 (10th Cir. 2010) (quoting *Chenery*, 332 U.S. at 196). And as we concluded above, Petitioners failed to exhaust: they did not present their NTA-defect claims to either the IJ or the BIA as premised on violations of claim-processing rules.

Finally, because exhaustion under § 1252(d)(1) is a claim-processing rule, it may be waived or forfeited. *See Santos-Zacaria*, 143 S. Ct. at 1115-16. The Government at most forfeited its exhaustion objections here. Because forfeiture "binds only the party not the court, . . . it is well-settled that courts have discretion to raise and decide [forfeited] issues sua sponte." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1270 (10th Cir. 2022) (quotations omitted).

We therefore exercise our discretion to consider whether Petitioners exhausted their § 1229(a) claim-processing arguments as required by § 1252(d)(1) and hold they have not. We decline to deprive the agency of the opportunity to address those arguments in the first instance. *See Garcia-Carbajal*, 625 F.3d at 1237; *Matter of Fernandes*, 28 I&N Dec. 605, 611-13 (BIA 2022).[11]

---

[11] In *Lopez-Reyes v. Garland*, No. 22-1014, 2023 WL 8919744 (4th Cir. Dec. 27, 2023) (unpublished), the Fourth Circuit considered whether to *sua sponte* enforce exhaustion under § 1252(d)(1) when the government failed to raise the petitioner's failure to exhaust. The court reaffirmed it had "inherent power to enforce mandatory claim-processing rules on [its] own initiative . . . but [it] decline[d] to do so" in that case. *Id.* at *2.

\*     \*     \*     \*

Because Petitioners failed to exhaust their claim-processing NTA arguments, we will not consider them and deny their petition on that issue.

## B. *Asylum*

On appeal, Petitioners argue the BIA and IJ erred in denying asylum by rejecting Ms. Miguel-Peña's claims that (a) she was persecuted and feared future persecution on account of on her anti-gang political opinion and (b) "women business owners in El Salvador" is a cognizable PSG.

### 1. **Legal Background**

To qualify for asylum, an applicant must be a "refugee," 8 U.S.C. § 1158(b)(1)(B)(i)—"unable or unwilling to return" to the applicant's country of nationality or habitual residence "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). "These five categories are called 'protected grounds.'" *Rodas-Orellana v. Holder*, 780 F.3d 982, 986 (10th Cir. 2015).

#### a. *Nexus*

To show persecution or fear of persecution "on account of" a protected ground, 8 U.S.C. § 1101(a)(42), an asylum applicant must establish a "nexus" between the alleged persecution and a protected ground, *Dallakoti v. Holder*, 619 F.3d 1264, 1267 (10th Cir. 2010). The protected ground must be "at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). "[I]t cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Orellana-Recinos v.*

*Garland*, 993 F.3d 851, 855 (10th Cir. 2021) (quoting *J-B-N-*, 24 I&N Dec. 208, 214 (BIA 2007)).

Because the protected ground must be "central to the persecutor's decision to act against the victim," the persecutor's motivations are relevant. *Rivera-Barrientos v. Holder*, 666 F.3d 641, 646 (10th Cir. 2012) (quotations omitted). Where "there [is] no evidence that the [persecutor] would be hostile toward the targeted [individuals] absent their financial or recruitment motives," there is no nexus to a protected ground. *Orellana-Recinos*, 993 F.3d at 853.

Whether the BIA applied the correct legal framework is a question of law, which we review de novo. *Rivera-Barrientos*, 666 F.3d at 645. Whether an applicant was persecuted "on account of" a protected ground is a question of fact that we review for "substantial evidence," *id.* at 647, and thus, "the BIA's findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary," *id.* at 645 (alterations and quotations omitted).

b. *Particular social group*

A PSG is "'a group of persons all of whom share a common, immutable characteristic such as sex, color, or kinship ties.' The common characteristic must be 'beyond the power of an individual to change or [one] that is so fundamental to his

21

identity or conscience that it ought not to be required to be changed.'" *Rodas-Orellana*, 780 F.3d at 990 (quoting *Matter of Acosta,* 19 I&N Dec. 211, 234 (BIA 1985)).[12]

*Matter of Acosta* is instructive. There, the petitioner claimed he suffered persecution based on his taxi cooperative membership. 19 I&N Dec. at 234. He alleged that guerillas threatened and murdered members of the taxi cooperatives for refusing to participate in work stoppages. *Id.* The BIA denied asylum because the proposed PSG was not cognizable. *Id.* It said "being a taxi driver" was not "immutable because the members of the group could avoid the threats of the guerillas . . . by changing jobs." *Id.*

Citing *Matter of Acosta*, we have similarly held that employment-based groups are not immutable and therefore are not PSGs. *See Jaramillo v. Ashcroft*, 119 F. App'x 233, 238 (10th Cir. 2004) (unpublished) (rejecting applicant's proposed PSG of high-ranking employees of Philip Morris); *Haimour v. Gonzales*, 165 F. App'x 594, 598 (10th Cir. 2006) (unpublished) ("[T]he immigration laws . . . do not recognize a protected right to maintain a particular job.").[13]

_____

[12] Because there is no statutory definition of a "particular social group," we have adopted the BIA's definition. *See, e.g.*, *Rivera-Barrientos v. Holder*, 666 F.3d 641, 650 (10th Cir. 2012); *Niang v. Gonzales*, 422 F.3d 1187, 1199 (10th Cir. 2005).

[13] Other circuits have held that business- or store-owner PSGs like Petitioners' proposed PSG of "women business owners in El Salvador" are not immutable. *See, e.g.*, *Canales-Rivera v. Barr*, 948 F.3d 649, 657-59 (4th Cir. 2020) (rejecting a business owner's proposed PSG of "merchants in the formal Honduran economy"); *Nadmid v. Holder*, 784 F.3d 357, 360-61 (7th Cir. 2015) (rejecting a proposed PSG of "Mongolian business owners who seek to expose and end political corruption of private businesses").

Whether a group qualifies as a particular social group under § 1102(a)(42) is a question of law subject to de novo review. *Cruz-Funes v. Gonzales*, 406 F.3d 1187, 1191 (10th Cir. 2005).

2. **Application**

Petitioners argue the BIA erred in evaluating (1) whether there was a nexus between Ms. Miguel-Peña's claimed persecution and her political opinion and (2) whether she was a member of a PSG. We discern no error.

a. *Nexus – political opinion*[14]

The BIA concluded that Ms. Miguel-Peña "ha[d] not met her burden to establish a nexus between any claimed persecution and an actual or imputed anti-gang political opinion." A.R., Vol. I at 4. It adopted the IJ's "factual finding[s] supported by the record as a whole," that

- "the gang members who threatened [her] d[id] so as part of an indiscriminate effort to extort money"; and

- there was "insufficient direct or circumstantial evidence to show that the gang members who threatened [Ms. Miguel-Peña] did so on account of any political opinion that she held, that they were aware of any political opinion she held, or that they attributed any political opinion to her based on her failure to comply with their criminal extortion demands."

---

[14] Both parties discuss the BIA's opinion as if it held there was no nexus between the alleged persecution and Ms. Miguel-Peña's membership in a PSG. But the BIA analyzed nexus between only the alleged persecution and her political opinion. *See* A.R., Vol. I at 4. We therefore limit our analysis to whether Ms. Miguel-Peña showed nexus between the alleged persecution and her political opinion.

*Id.* at 4-5. Petitioners make three arguments on how the BIA erred, but we are not persuaded.

First, Petitioners argue the BIA applied the wrong legal framework by focusing on the persecutors' motives rather than Ms. Miguel-Peña's political opinion. But there is no nexus when "there [is] no evidence that the gang would be hostile toward the targeted [individuals] absent their financial or recruitment motives." *Orellana-Recinos*, 993 F.3d at 853. Nexus thus requires consideration of the persecutors' motives.

Second, Petitioners argue substantial evidence did not support the IJ and BIA's factual findings on the persecutors' motives. We disagree. The record contains no evidence that Ms. Miguel-Peña was or would be targeted because of her political opinion. The only evidence of her political opinion appeared in her asylum declaration, which stated she did not pay the extortion money because she "th[ought] gang control was wrong." A.R., Vol. I at 249. But there is no evidence that MS-13 was aware of this opinion. And Ms. Miguel-Peña stated in the same declaration that she refused to pay MS-13 because she did not have the money. *Id.* Ms. Miguel-Peña therefore failed to establish that her political opinion "was a central reason for MS-13's actions." *Rodas-Orellana*, 780 F.3d at 996. Her "testimony suggest[ed] only that the gang wanted to take [her] money." *Id.*; *see also Rivera-Barrientos*, 666 F.3d at 646-47. Substantial evidence supports the IJ and BIA's factual findings.

Third, Petitioners assert the BIA erred by requiring proof of individual targeting rather than looking to Ms. Miguel-Peña's evidence of a pattern or practice of persecution against similarly situated individuals. *See* Pet. Br. at 32-35. But as the Government

24

correctly notes, Ms. Miguel-Peña failed to make a pattern-or-practice argument before the BIA. *See* Resp. Br. at 17. We therefore do not address it. *See Santos-Zacaria*, 143 S. Ct. at 1115; *Gomez*, 2023 WL 7126420, at *5.

In sum, the BIA did not err in its nexus analysis.

b. *Particular social group*

Petitioners attempt to challenge the BIA's conclusion that Ms. Miguel-Peña's proposed PSG is not immutable, and thus not a cognizable PSG, on three grounds. We reject each one.

First, Petitioners argue, as a factual matter, that Ms. Miguel-Peña could not change her job because "owning a business is virtually [the] only realistic economic option" for "women in El Salvador." Pet. Br. at 46. But the BIA found that Petitioners' own evidence showed alternative employment options were available for women in El Salvador, including employment in "wholesale and retail trade, manufacturing (especially in *maquila* plants) and domestic service, and in public, social or health services." A.R., Vol. I at 5-6 (quoting Exhibit 6:H submitted by Ms. Miguel-Peña in support of her asylum application). The BIA also noted that Ms. Miguel-Peña did not submit evidence showing she had "attempted to find another form of employment, that she was unable to do so, or that ownership of her business was somehow fundamental to her identity." *Id.* at 6. Substantial record evidence supports these factual findings.

Second, Petitioners argue, as a legal matter, that a PSG is immutable when it is defined by characteristics that a person "should not be required to change as it would impact their very identity." Pet. Br. at 42. But as the BIA has explained, "the

internationally accepted concept of a refugee simply does not guarantee an individual a right to work in the job of his choice," meaning that an asylum applicant may be required to change jobs to avoid future persecution. *Matter of Acosta*, 19 I&N Dec. at 234.

Third, Petitioners contend, as a legal matter, that past employment cannot be changed and therefore the PSG of "women business owners in El Salvador" is immutable. But in *Matter of Acosta*, the BIA explained the petitioner did not belong to an immutable PSG because he could change his employment and then avoid persecution. *Id.* The same is true here.[15]

We agree with the BIA's denial of asylum based on the mutability of Ms. Miguel-Peña's proposed PSG of "women business owners in El Salvador."

### III. CONCLUSION

We deny the petition for review.

---

[15] The out-of-circuit cases Petitioners cite as holding that past employment can define a cognizable PSG are distinguishable. In those cases, the individual's past employment experience imparted a particular knowledge or otherwise marked the individual in some way that would follow that person into a new job. *See Cece v. Holder*, 733 F.3d 662, 670 (7th Cir. 2013) (explaining a past experience can "impart[] some knowledge or labeling that cannot be undone"); *Plancarte Sauceda v. Garland*, 23 F.4th 824, 834 (9th Cir. 2022). For example, in holding that female nurses could be a PSG, the Ninth Circuit explained the petitioner could "[]not avoid compulsion by the cartel simply by changing jobs, because even if she ceased *employment* as a nurse, she would still *be* a nurse" and "would retain her medical knowledge and nursing skills" that made her "valuable to the cartel." *Plancarte Sauceda*, 23 F.4th at 834. Ms. Miguel-Peña has offered no evidence that her employment experience as a female business owner is comparable to the facts in these cases.